UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
EDDY REYES,

       Plaintiff,

     - against -

PHOENIX BEVERAGES, INC.,

       Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
13-CV-5588 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

   Plaintiff Eddy Reyes ("Plaintiff") filed this action on October 9, 2013, alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code. § 8-107.  (Dkt. 1.)  According to Plaintiff, after taking leave under the FMLA, he was not permitted to return to his sales representative position with Defendant Phoenix Beverages, Inc. ("Defendant").  Plaintiff alleges that Defendant's failure to restore him to the same, or an equivalent, position violated Plaintiff's rights under the FMLA.  *See* 29 U.S.C. § 2615.  Plaintiff further claims that Defendant discriminated against him with respect to the terms and conditions of his employment on the basis of his temporary disability, in violation of the NYCHRL.  *See* N.Y.C. Admin. Code § 8-107.[1]  The parties filed cross-motions for summary judgment on January 12, 2016.  (Dkts. 43, 55.)  For the reasons set forth below, both parties' motions for summary judgment are DENIED.

---

[1] In a conference held before the Court on August 20, 2015, Plaintiff clarified that his claim under the NYCHRL is based, not on Defendant's failure to accommodate Plaintiff's disability, but on Defendant's decision not to allow Plaintiff to return to his former job, despite Plaintiff being physically able to perform the essential functions of his job.  (8/20/15 Minute Entry.)  Plaintiff also clarified that he is not alleging that Defendant retaliated against him for exercising his rights under the FMLA.  (*Id.*)

*BACKGROUND*

I.    General Background Information

Defendant, a beverage distribution company, employed Plaintiff as an On Premises Sales

Representative beginning in June 2011.  (Pl. 56.1[2] ¶¶ 1–2; Def. 56.1 ¶ 1.)  Each On Premises Sales

Representative had his own territory, for which he was solely responsible.  (Def. 56.1 ¶ 2.)  Plaintiff

was responsible for a territory comprising eight distinct areas within Brooklyn, New York, and

---

[2] The facts in this section are taken from the parties' various Rule 56.1 submissions and the record evidence cited therein.  Local Rule 56.1 "requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact. . . . If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."  *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003); *see also Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003) (A party's "failure to respond or contest the facts set forth [in the moving party's] Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed.") (quotation marks omitted).

Because the parties have cross-moved for summary judgment, there are four factual statements before the Court:  Plaintiff's Local Rule 56.1(a) Statement of Materials Facts in support of Plaintiff's motion for summary judgment ("Pl. 56.1") (Dkt. 55-1); Defendant's Response to Plaintiff's Statement of Material Facts ("Def. Opp. 56.1") (Dkt. 62); Defendant's Rule 56.1 Statement in support of Defendant's motion for summary judgment ("Def. 56.1") (Dkt. 46); and Plaintiff's Rule 56.1(b) Statement of Undisputed Material Facts in response to Defendant's Rule 56.1 statement ("Pl. Opp. 56.1") (Dkt. 53).

Unless otherwise noted, a standalone citation to a Rule 56.1 Statement denotes that the Court has deemed the underlying factual allegation undisputed.  *Compare Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73–74 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the [56.1] Statements, the Court is free to disregard the assertion" and review the record independently.) (quotation marks omitted), *with Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."), *and Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.") (quotation marks omitted).  Any citations to a party's Rule 56.1 Statement incorporates by reference the documents cited therein, though where relevant, the Court has cited directly to those underlying documents.  In connection with their respective summary judgment papers, the parties submitted many of the same exhibits.  Rather than using parallel citations to the same document, in most instances, for its convenience, the Court has cited to those attached to Defendant's papers.

worked Monday through Friday, from 10:00 am to 7:00 pm. (Pl. 56.1 ¶ 2; Def. 56.1 ¶ 3–4.) On each workday, Plaintiff would visit between 10 to 20 retail accounts, selling and taking inventory requests from each account. (Pl. 56.1 ¶ 3; Def. 56.1 ¶ 5.) Using his personal vehicle, Plaintiff would drive from his home to his sales territory, and within his territory, Plaintiff would either drive from one account establishment to another and walk from his car into each establishment, or park his car and walk from one establishment to another. (Pl. 56.1 ¶ 4; Def. 56.1 ¶ 5.)

According to Plaintiff, the amount he had to walk between establishments varied depending on the size of the territory and the proximity of each account establishment to another. (Pl. 56.1 ¶ 4.) According to Defendant, however, Plaintiff's walking was not limited to going between account establishments, but also included Plaintiff collecting cash and checks from each account and then walking to the nearest Chase ATM to deposit them. (Def. 56.1 ¶ 5; Def. Opp. 56.1 ¶ 4; *see also* Pl. 56.1 ¶ 5 (when Plaintiff received a check from an account, "he would deposit the checks into the Defendant's bank account").) Moreover, Plaintiff was responsible for placing at each account establishment point of sales ("POS") visual advertisements promoting Defendant's products. This involved Plaintiff picking up materials such as "posters, clocks, mirrors, and similar colorful, attention[-]diverting materials" from Defendant's headquarters, loading them into his car, and then removing them from his car and placing them in prominent locations at each account establishment. (Def. 56.1 ¶ 6; Def. Opp. 56.1 ¶ 4.) And on so-called "catch-up Fridays," Plaintiff would also visit non-customer establishments in his territory to convince them to become Defendant's customers, which involved pushing and pulling into each establishment a sample taste kit on wheels containing alcoholic products and weighing about 40 pounds. (Def. 56.1 ¶ 7; Def. Opp. 56.1 ¶ 4.)

Plaintiff reported to his direct supervisor, William Tierno, and also to Defendant's sales

manager, Frank Fiorenza, who was Tierno's supervisor. (Pl. 56.1 ¶ 6.) Plaintiff was a "good employee," in that he "showed up to work every day, did his due diligence, seldom took time off, and never received negative comments from customers," (Pl. 56.1 ¶ 7), though Defendant notes that Plaintiff failed to deposit two customer checks on November 20, 2012, which, Defendant alleges, is normally grounds for automatic termination (Def. Opp. 56.1 ¶ 7; Supp. D'Ablemont Decl.[3] Ex. E (Tierno Deposition) at 45:14–47:4, 49:6–8, 55:13–16; Ex. F (Fiorenza Deposition) at 46:24–47:7, 54:10–55:3).) As of November 26, 2012, Plaintiff had worked for Defendant for over 12 months and had worked over 1,250 hours. (Pl. 56.1 ¶ 8.)

II.     Plaintiff's Accident and Subsequent Serious Health Condition

In the early morning of November 26, 2012, Plaintiff sustained a non-work-related serious injury in an automobile accident. (Pl. 56.1 ¶ 9; Def. 56.1 ¶ 8.) Plaintiff was taken to the hospital, suffering from lower back pain, neck pain, and a severe ankle sprain. (Pl. 56.1 ¶ 10.) Tierno was called and made aware of Plaintiff's accident on the day that it happened, though the parties dispute whether it was Plaintiff himself or Plaintiff's cousin who made the call. (*Compare id.* ¶ 11, *with* Supp. D'Ablemont Decl. Ex. E at 41:5–20.) The next day, on November 27, 2012, Plaintiff went to Defendant's office to apply for and receive the U.S. Department of Labor FMLA package, with his 12-week FMLA leave ending on Friday, February 15, 2013.[4] (Pl. 56.1 ¶ 12; Def. 56.1 ¶ 9.) The FMLA package included a form Plaintiff was required to return to Defendant's Human Resources department within two weeks of November 27, 2012, "apply[ing] for the Family and

---

[3] All citations to "Supp. D'Ablemont Decl." refer to the Supplemental Declaration of Eugene T. D'Ablemont in Opposition to Plaintiff's Motion for Summary Judgment. (Dkt. 58.)

[4] Plaintiff contends that his 12-week FMLA leave ended on Sunday, February 17, 2013 (Pl. Opp. 56.1 ¶ 9), but this distinction is immaterial, as it is undisputed that Plaintiff's workweek extended only from Monday to Friday, such that the last workday of his FMLA leave was Friday, February 15, 2013 (Pl. 56.1 ¶ 2; Def. 56.1 ¶ 4).

Medical Leave Act." (D'Ablemont Decl.[5] Ex. 10 at ECF 3–7.) It appears that Plaintiff returned this form on either December 26 or 28, 2012. (*Id*. at ECF 7 (handwriting illegible).)

III.    Plaintiff's Medical Examinations and Communications Regarding Returning to Work

On December 18, 2012, Plaintiff was examined by one of his doctors, Steven Horowitz of Brooklyn Premier Orthopedics. (Def. 56.1 ¶ 12.) Dr. Horowitz prepared a medical evaluation dated December 24, 2012, in which Dr. Horowitz stated that Plaintiff was "disabled and unable to return to work," that he had been disabled since November 26, 2012 and would be through December 26, 2012, and that a further evaluation was necessary and would take place on January 3, 2013. (Pl. 56.1 ¶ 14;[6] Def. 56.1 ¶ 13; D'Ablemont Decl. Ex. 8.)

On December 26, 2012, Dr. Horowitz filled out the form attached to Plaintiff's FMLA package, stating that Plaintiff was "unable to perform" certain job functions due to his accident, enumerating them as follows: "heavy lifting/bending/pushing/pulling; prolonged sitting/standing > 1–2 hours." (D'Ablemont Decl. Ex. 10[7] at ECF 4–5; *see also* Def. 56.1 ¶ 15.) Dr. Horowitz

---

[5] All citations to "D'Ablemont Decl." refer to the Declaration of Eugene T. D'Ablemont in Support of Defendant's Motion for Summary Judgment. (Dkt. 44.)

[6] Plaintiff asserts that "he was disabled and unable to return to work *until* December 26, 2012" (Pl. 56.1 ¶ 14), while Defendant clarifies that Dr. Horowitz's report stated Plaintiff was disabled *through* December 26, 2012 (Def. Opp. 56.1 ¶ 14). Dr. Horowitz's report does, indeed, list Plaintiff's disability as extending *through* December 26, 2012. (*See* D'Ablemont Decl. Ex. 8.)

[7] Defendant dates this medical evaluation as "[o]n or about December 26 or December 28." Def. 56.1 ¶ 15.) While the handwriting on the document is unclear (*see* D'Ablemont Decl. Ex. 10 at ECF 7), it seems almost certain that the date was December 26, 2012, as it is undisputed that Plaintiff submitted the evaluation to Defendant on December 26, 2012 (*see* Pl. 56.1 ¶ 15; Def. Opp. 56.1 ¶ 15). (*Cf.* Def. Mot. at 16 (Plaintiff returned FMLA package on "December 26, 2012 or shortly thereafter").)

All citations to "Def. Mot." refer to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment. (Dkt. 45.) All citations to "Pl. Opp." refer to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Dkt. 54), and all citations to "Def. Reply" refer to Defendant's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment (Dkt. 48).

noted that Plaintiff was incapacitated as of November 26, 2012, a condition ongoing at least until a reassessment scheduled for January 3, 2013, and that he would "possibly" have episodic flare-ups that would prevent him "from performing his/her job functions," though he noted that Plaintiff's symptoms were "gradually remitting." (D'Ablemont Decl. Ex. 10 at ECF 5–6; *see also* Def. 56.1 ¶¶ 15–16.) Dr. Horowitz noted, however, that further assessments would be made, even if Plaintiff returned to work, with such post-return assessments to be conducted "once monthly x 3 months then every 6 months/PRN [pro re nata, or as needed]." (D'Ablemont Decl. Ex. 10 at ECF 6.)

A.  Plaintiff's First Alleged Attempt to Return to Work

Plaintiff asserts that he first attempted to return to work on December 26, 2012, when he delivered Dr. Horowitz's medical evaluation from that day to Angelo Sgro, Defendant's Director of Human Resources. Plaintiff further alleges that he was able to reassume his duties, either that day or the next, December 27, 2012, but that Defendant did not permit him to return to work at that time. (Pl. Opp. 56.1 ¶ 14 (alleging that Plaintiff "attempted to return to work on December 26, 2012" and "was able to reassume his position on December 27, 2012"); Pl. 56.1 ¶¶ 14–15 (Plaintiff was "unable to return to work until December 26, 2012" and "attempted to return to work" on that day but "was told that he was unable to").)

On January 3, 2013, Plaintiff submitted a letter to Defendant stating that he was "physically capable of returning to [his] previous responsibilities as a sales representative," but the letter was unaccompanied by any medical certification and did not indicate that any such medical certification existed. (Pl. 56.1 ¶ 15; Def. 56.1 ¶ 17; D'Ablemont Decl. Ex. 1.)

On January 7, 2013, Plaintiff was reevaluated, this time by Dr. Raz Winiarsky, a surgeon at Brooklyn Premier Orthopedics. (Pl. 56.1 ¶ 16; Def. 56.1 ¶¶ 20–21.) Dr. Winiarsky recommended, *inter alia*, that Plaintiff undergo arthroscopic surgery on his left ankle, which

Plaintiff did on January 17, 2013. (Pl. 56.1 ¶¶ 16–17; Def. 56.1 ¶¶ 22–23.) Plaintiff's post-operation instructions indicated that he was to use a cane to walk, wear a post-operation special shoe, and return in a week for a re-assessment (Def. 56.1 ¶ 24), though Plaintiff contends that in a post-operation telephonic assessment, he reported experiencing no pain (Pl. Opp. 56.1 ¶ 24; *see also* D'Ablemont Decl. Ex. 14 at ECF 4).

B.    <u>Defendant's January 25, 2013 Transmission of Job Description to Plaintiff's Doctors</u>

On January 25, 2013, Sgro provided Plaintiff with a letter to deliver to his doctors so that they "could make a reasoned return to work evaluation of Plaintiff to his sales rep position." (Def. 56.1 ¶ 25; *see also* Pl. 56.1 ¶ 18 ("Sgro sent the job description of an on-premise sales representative to [Plaintiff's] orthopedists.") The letter was addressed to Dr. Horowitz, attached "a copy of the complete description of On Premise[s] Sales Representative duties performed by [Plaintiff]," and asked Dr. Horowitz to "review the job description and advise [Defendant] of any restricted physical activity at [the doctor's] earliest convenience." (D'Ablemont Decl. Ex. 4.)

The job description attached to the letter summarized the duties of an On Premises Sales Representative as maximizing[8] "the selling of the company portfolio in on-premise accounts," and "[g]row[ing] sales and distribution through relationship building, selling methods and company resources." (D'Ablemont Decl. Ex. 5 at 1.) The job description then listed a number of "Key Activities," which included (1) "report[ing] daily to his/her supervisor in order to communicate all relevant market and customer information," (2) "utiliz[ing] his/her PDA to complete and maintain all records of activities as required by company policy, procedures and direction . . . [and] to look up and maintain up-to-date account information, to input orders, to obtain company information

---

[8] The job description actually used the phrase "[t]o *maximum* the selling of the company portfolio" (D'Ablemont Decl. Ex. 5 at 1 (emphasis added)), which the Court presumes to be a typographical error.

and use the information to support the selling effort," (3) "cover[ing] his route itinerary in calling on his/her customers according to company standards, service policy and customer standards," (4) "[e]xecut[ing] Company POS in line with prescribed company and supplier standards/requirements," (5) "[m]anag[ing] credit, Account Receivable dollars," which includes "[c]ollect[ing] [c]ash" and managing "[b]ounced [c]hecks" and "delinquent accounts," (6) "[s]triv[ing] to achieve Sales and Distribution goals set by manager by executing company portolio in buy and non-buy accounts," (7) "[r]espond[ing] immediately to potential product refusals, to avoid missed delivery issues and ensure timely merchandising to maximize customer satisfaction," and (8) "[i]nsur[ing] accounts have necessary tools to successful sell [sic] [Defendant's] products . . . ." (*Id*.)

The job description then enumerated a host of "Responsibilities," which included, *inter alia*, "accomplish[ing] the sales and distribution objectives that are set by the Sales Man[a]ger and District Manager and provid[ing] the necessary follow up in connection with his or her selling effort," "sell[ing] the entire company portfolio . . . ," "determin[ing] the product needs of a customer through personal discussion with the retailer, as well as knowledge of target area's consumer landscape," "own[ing]" "[a]ll stores in rep's 'territory'" as "his or her[] responsibility," "[i]dentify[ing] opportunities to grow the business and improve sales . . . ," [b]uild[ing] relationships with key account contact to ensure maximum business opportunity," and "[h]andl[ing] issues pertaining to delivery problems and work[ing] with drivers and account owners to remedy situation." (*Id*. at 1–2.) The "Required Knowledge/Skills/Abilities" section included in the job description did not list any physical skills, such as walking, standing, pushing, or pulling, but rather, focused on customer-service oriented skills such as "Industry knowledge," "Product/Brand Knowledge," "Business Math skills," "Customer Service skills," "Selling

Skills/techniques," "Interpersonal (relationship building) skills," "Oral and written communication skills," "Computer skills," and "Time management/Organization." (*Id*. at 2.)

C.     <u>Plaintiff's February 5, 2013 Medical Evaluation and February 7, 2013 Letter</u>

In response to Defendant's January 25, 2013 letter, Dr. Winiarsky advised Defendant in a letter dated February 5, 2013 that Plaintiff was "able to return to work full time, however he should refrain from any prolonged walking or standing, running or jumping."[9] (Def. 56.1 ¶ 26; Pl. 56.1 ¶ 18; D'Ablemont Decl. Ex. 6.) Two days later, on February 7, 2013, Plaintiff submitted his own letter to Defendant, stating that he was "currently physically capable of returning to [his] previous responsibilities as a sales representative," and purporting to "confirm [a] conversation on February 7th 2013" between himself and Sgro, in which Sgro allegedly told Plaintiff that "[Plaintiff's] previous position was no longer available," but that Sgro "was going to arrange a new position for [Plaintiff]," such that Plaintiff could "return to work within 3 to 4 weeks," and that Plaintiff "should go on unemployment for the meantime." (Def. 56.1 ¶ 28; D'Ablemont Decl. Ex. 2.) In a handwritten statement, signed under penalty of perjury on December 7, 2015, Sgro denied making any such representations.[10] (Supp. D'Ablemont Decl. Ex. A (Angelo Sgro's Handwritten Response to Plaintiff's Affidavit) ¶ 6 ("It is not true that in response to any request that [Plaintiff] may have made to me . . . on February 7, 2013 or at any time that I told him that his position was

---

[9] As discussed in detail, *infra*, Defendant contends that prolonged walking and standing are the "primary essential duties of Plaintiff's sales representative position" (Def. 56.1 ¶ 27), while Plaintiff, disputing this, notes that the job description provided by Defendant to Plaintiff's orthopedists did not mention either walking or standing (Pl. Opp. 56.1 ¶ 27).

[10] Although Plaintiff has not yet deposed Sgro, due at least initially to Sgro being "medical unavailable," because Plaintiff himself "elected not to proceed with the written deposition" of Sgro, and because, in any event, Plaintiff will have an opportunity to depose Sgro in advance of any trial, the Court has considered Sgro's statement. (*See* 5/28/15 Dkt. Order; Dkt. 29.) Furthermore, even if Sgro's statement were not considered, the Court would find material facts in dispute regarding whether Defendant improperly refused to reinstate Plaintiff after his FMLA leave expired.

not available or would not be available for a few weeks but that a new position would be created for him in three to four weeks."); *id.* ¶ 8 ("It is not true that . . . I encouraged [Plaintiff] to file for unemployment benefits until a new position was 'created,'" because Sgro "had no authority to create a new position . . . .").)

It was Defendant's standard policy, applicable to all sales representatives who took leave for a medical condition and wanted to return to work, that they get a medical release stating they could return to full duty without restrictions. (Def. 56.1 ¶¶ 18–19.) In connection with Sgro's January 25, 2013 letter to Dr. Horowitz, Sgro communicated that requirement orally to Plaintiff. (Reyes Dep.[11] at 194:20–195:11.)

IV. <u>Plaintiff's Receipt of Disability and Unemployment Benefits</u>

Plaintiff applied for weekly short-term disability payments on December 14, 2012, submitting a form filled out by Dr. Horowitz, in which Dr. Horowitz stated that Plaintiff had been "continuously disabled (unable to work)" from November 26, 2012 through the date of the form's submission (Dr. Horowitz's portion was undated), with a reevaluation scheduled for January 3, 2013. (Pl. 56.1 ¶ 13; Def. 56.1 ¶ 10; D'Ablemont Decl. Ex. 12 at ECF 6–7.) Plaintiff received disability payments of $170 each week, beginning retroactively on December 4, 2012, and continuing through February 17, 2013. (Def. 56.1 ¶¶ 11, 29.)

In a form signed by Plaintiff on February 1, 2012[12] and by Sgro on February 7, 2013, Plaintiff directed Defendant's insurance carrier, Mutual of Omaha, to stop paying him disability

---

[11] All citations to "Reyes Dep." refer to excerpts from Plaintiff's deposition testimony, attached as both Exhibit 3 to the D'Ablemont declaration, and as Exhibit 5 to the Affirmation of Mark L. Lubelsky in Support of Plaintiff's Motion for Summary Judgment (Dkt. 60).

[12] In light of the dates of Plaintiff's accident and of the other signatures on the form, the Court presumes the 2012 date is likely a typographical error, meant to be 2013.

benefits because he was "able to work" and "expect[ed] to return to work" on February 18, 2013. (D'Ablemont Decl. Ex. 18; *see also* Def. Opp. 56.1 ¶ 20 (describing document as a form "direct[ing] [Defendant's private insurer] in writing to stop paying [Plaintiff] disability benefits as of February 18, 2013").)[13]  Plaintiff stopped receiving these benefits as of February 18, 2013. (Def. 56.1 ¶ 29; Def. Opp. 56.1 ¶ 20.)  Defendant contends that, on February 18, 2013, Plaintiff did not request his job back, but rather, began receiving unemployment compensation payments of $405 per week.  (*See* Def. 56.1 ¶ 30; Pl. Opp. 56.1 ¶ 30.)[14]  After Plaintiff's February 7, 2013 request, he made no subsequent requests to return to work (Def. 56.1 ¶ 38), though Plaintiff asserts that this was because he relied on Sgro's alleged statement of February 7 that a new position would be created for him within three to four weeks of that date (Pl. Opp. 56.1 ¶ 38).  In a subsequent

---

[13] Creating a murky timeline regarding this particular document, the disability form in question included a "Certificate of Attending Physician" portion, signed by Dr. Winiarsky on March 5, 2013, which stated that Plaintiff was not "currently disabled" and "can work full time," though only as of March 6, 2013.  (D'Ablemont Decl. Ex. 18.)  However, Defendant describes this document as a "response to a form request from Defendant's [private insurer]."  (Def. 56.1 ¶ 33 (Defendant mistakenly cites this as Exhibit 16 of the D'Ablemont declaration, but description of the document is of Exhibit 18).)

Moreover, a document from the private insurer indicates that Plaintiff's "[b]enefits ceased as of 02/18/2013" because Plaintiff "was released to return to work according to medical evidence on file" (Supp. D'Ablemont Decl. Ex. C)—medical evidence which Defendant claims was, in fact, the disability form in question (Def. Opp. 56.1 ¶ 20).  In other words, despite the convoluted history of Plaintiff's FMLA leave, what is clear is that, as of February 18, 2013, when Plaintiff's FMLA leave expired, the only medical evidence Defendant had was the February 5, 2013 letter stating that Plaintiff could return to work "full time, . . . [but] should refrain from any prolonged walking or standing, running or jumping."  (Def. 56.1 ¶ 26.)

[14] The evidence proffered by Defendant—an email attaching Plaintiff's unemployment compensation payment history—indicates payments of $405 as of the "week ending" February 17, 2013.  (*See* D'Ablemont Decl. Ex. 15.  *See also* Supp. D'Ablemont Decl. Ex. D at 1 (Plaintiff "began collecting unemployment benefits in the amount of $405.00 per week starting on week ending 02/17/2013 (which was for 02/11/2013 – 02/17/2013) . . . .").)  This would have been the first workweek, beginning on Monday, February 11, 2013, after Plaintiff's February 7, 2013 letter requesting to return to work based on medical certification indicating he could return "full time" but "should refrain from any prolonged walking or standing, running or jumping."  (D'Ablemont Decl. Ex. 6.)

report dated April 4, 2013, Dr. Winiarsky stated that Plaintiff "was unable to work from 11/26/2012 till 2/25/2013 due to the motor vehicle accident on 11/26/2012." (Def. 56.1 ¶ 31; D'Ablemont Decl. Ex. 16.)

*LEGAL STANDARD*

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). In ruling upon a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences against the moving party, construing any disputed facts in the nonmoving party's favor. *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan,* 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001).

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski*, 613 F.3d at 340. Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party cannot

avoid summary judgment simply by relying on "conclusory allegations or unsubstantiated speculation," but must instead "offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quotation marks omitted). Nor is a mere "scintilla of evidence" in support of the nonmoving party sufficient; rather, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation marks omitted) (alteration in original); *see also Anderson*, 477 U.S. at 248 (a dispute of fact must be "genuine"—that is, "the [record] evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party."); *Miner v. Clinton Cty.*, 541 F.3d 464, 471 (2d Cir. 2008) (nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful") (quotation marks omitted). In other words, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

*DISCUSSION*

I.   Judicial Estoppel

The Court addresses at the outset Defendant's argument, as to both Plaintiff's FMLA and NYCHRL claims, that Plaintiff is estopped from arguing that he was fit to return to work in light of having asserted that he was unable to work on a short-term disability form and receiving benefits based thereon. (Def. Mot. at 22–25; Def. Reply at 8–10; Def. Opp.[15] at 22–24.) As Plaintiff argues (Pl. Opp. at 14–20), Defendant has waived this affirmative defense by failing to plead it in its

---

[15] All citations to "Def. Opp." refer to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment. (Dkt. 59.) All citations to "Pl. Mot." refer to Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (Dkt. 61), and all citations to "Pl. Reply" refer to Plaintiff's Memorandum of Law in Reply and in Further Support of Plaintiff's Motion for Summary Judgment (Dkt. 64).

answer to Plaintiff's Complaint.

Defendant's Answer, filed on November 11, 2013, asserts five affirmative defenses. (Dkt. 5.) Defendant contends that the fifth such defense—that "[b]y his actions, Plaintiff was not entitled to any relief from Defendant" (*id*. at 4)—"clearly alleges" judicial estoppel and therefore precludes a finding of waiver, as does the fact that "Plaintiff's application for and receipt of disability benefits was a significant part of the discovery in this case" and that "Defendant's counsel repeatedly referred to . . . the doctrine of judicial estoppel" at an August 20, 2015 pre-motion conference before the Court, as well as in submissions to the Court in advance thereof. (Def. Reply at 8–9.) These arguments are all unavailing.

As an initial matter, Defendant is incorrect that its fifth affirmative defense suffices as an assertion of the defense of judicial estoppel. "Rule 8(c) of the Federal Rules of Civil Procedure requires that a responsive pleading must set forth certain enumerated affirmative defenses. . . . One of the core purposes of Rule 8(c) is to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (rejecting argument that defendants sufficiently pleaded preemption by asserting in answer "general defense of failure to state a claim"). Defendant's assertion that "[b]y his actions, Plaintiff was not entitled to any relief from Defendant" is clearly insufficient to "place the opposing part[y] on notice" that the "particular defense" of judicial estoppel would be pursued. *See id*.

While "a district court may still entertain affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings," to do so, the court should "construe the motion for summary judgment as a motion to amend the defendant's answer." *Id*. at 350–51. But

such motions to amend are themselves governed by the Federal Rules of Civil Procedure, namely Rules 15 and 16. "Where a scheduling order has been entered, the lenient standard under Rule 15(a), which provides leave to amend 'shall be freely given,' must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause,'" which "depends on the diligence of the moving party." *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003); *see also Carpenter v. Churchville Greene Homeowner's Ass'n*, No. 09-CV-6552, 2011 U.S. Dist. LEXIS 115948, at *12–13 (W.D.N.Y. Sept. 29, 2011), *adopted in its entirety*, 2011 U.S. Dist. LEXIS 137882 (W.D.N.Y. Dec. 1, 2011) ("[W]here a scheduling order has issued establishing a deadline for motions to amend pleadings, motions to amend to assert affirmative defenses must be filed by that deadline unless good cause can be established for an extension.").

The Honorable Vera M. Scanlon issued a scheduling order on March 12, 2014, setting August 30, 2014 as the deadline for amendment of the pleadings. (*See* Dkt. 8.) No good cause for Defendant's delay in seeking to amend its answer to assert the defense of judicial estoppel has been demonstrated, nor does any seem readily apparent; indeed, the fact that, as Defendant claims, "Plaintiff's application for and receipt of disability benefits was a significant part of the discovery in this case" would seem to indicate that Defendant knew relatively early on in the case that it intended to assert this defense, yet failed to put Plaintiff on notice thereof until after the close of discovery, at the August 20, 2015 pre-motion conference. (*See* Def. Reply at 8–9.) S*ee Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, No. 05-CV-5155, 2010 U.S. Dist. LEXIS 23613, at *7–9 (E.D.N.Y. Mar. 15, 2010) (rejecting defendant's attempt to assert new defense of judicial estoppel on eve of trial and finding its "assertion of a general estoppel defense in its Answer []  insufficient" to have preserved this defense, particularly where judicial estoppel "was clearly

available to [defendant] over the course of more than four years since this litigation was commenced").

Defendant argues that judicial estoppel "is not waivable," since courts can raise the issue *sua sponte* at any time. (Def. Reply at 9 (citing *Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 363 n.3 (S.D.N.Y. 2011), *aff'd*, 484 F. App'x 616 (2d Cir. 2012)).) While it is true that a court may raise judicial estoppel *sua sponte* and a failure to plead that affirmative defense "does not foreclose a court's review of the issue," courts may nevertheless find the defense to have been waived. *See, e.g., Frittita v. Fanny's Supper Club*, No. 98-CV-781S, 2000 U.S. Dist. LEXIS 23071, at *15–16 (W.D.N.Y. Aug. 8, 2000) (denying as "inappropriate" defendant's motion to amend answer to assert judicial estoppel defense on first day of trial); *see also Am. Mfrs. Mut. Ins. Co.*, 2010 U.S. Dist. LEXIS 23613, at *7–9. In light of the history of the case here, Defendant's long delay in asserting this defense—*i.e.*, more than one year after the deadline for amending the complaint and only after the close of discovery—and the absence of any showing of good cause to permit Defendant to amend its Answer now, the Court finds that Defendant has waived the defense of judicial estoppel.

But if the Court permitted this defense to go forward, Defendant's judicial estoppel argument would fail. In support of its argument, Defendant relies entirely on *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 272–73 (3d Cir. 2012), a Third Circuit decision affirming the district court's grant of summary judgment in defendant's favor on the basis that judicial estoppel barred the plaintiff's FMLA claims "because he continued to receive disability benefits" through the end of his FMLA leave. This Court, however, is not bound by *Macfarlan*, and instead chooses to follow the Second Circuit's reasoning in *Simon v. Safelite Glass Corp.*, 128 F.3d 68 (2d Cir. 1997). There, the Second Circuit affirmed the application of judicial estoppel to a plaintiff's claims under

the Age Discrimination in Employment Act ("ADEA") where the plaintiff had "made statements under penalty of perjury to the Social Security Administration that he was 'unable to work.'" *Id*. at 72–73. The Second Circuit reasoned that judicial estoppel functions as "a means to preserve the sanctity of the oath or to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings," and therefore was applicable even to administrative proceedings because "[a]scertaining the truth is as important in an administrative inquiry as in judicial proceedings." *Id*. at 71–72 (noting that "Social Security disability determinations are, in essence, adjudicative").

There is nothing in *Simon* that indicates or suggests that judicial estoppel applies to a situation where, as here, a plaintiff made an allegedly inconsistent statement to a *private insurer* in seeking disability benefits.[16] Indeed, the justification for applying judicial estoppel as articulated in *Simon*—*i.e*., "protect[ing] judicial integrity by avoiding the risk of inconsistent results in two proceedings"—does not justify estoppel here.[17] *See, e.g., Eaton v. Goodstein Mgmt., Inc.*, No. 97 Civ. 6582, 1999 U.S. Dist. LEXIS 17655, at *14–16 (S.D.N.Y. Nov. 15, 1999) (declining to apply judicial estoppel to bar plaintiff's ADEA or Americans with Disabilities Act ("ADA") claims where plaintiff "filled out [an] application to receive benefits from a private insurer").

---

[16] While Plaintiff's initial disability form contained no language regarding perjury or the consequences of false statements (*see* D'Ablemont Decl. Ex. 12), Plaintiff's "Supplementary Report of Claim-Statutory Disability Benefits" form—in which Plaintiff "directed [Defendant's private insurer] in writing to stop paying him disability benefits as of February 18, 2013 (Def. Opp. 56.1 ¶ 20)—stated at the top, in bold capital letters, that "any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime" (D'Ablemont Decl. Ex. 18).

[17] This conclusion does not necessarily preclude Plaintiff from being questioned or impeached at trial about his claim of disability.

Finally, and in any event, the evidence is insufficient to find estoppel on Plaintiff's claims as a matter of law. At most, Plaintiff's statement to Defendant's disability insurance company was that he expected to be able to return to work on February 18, 2013, and indeed, Plaintiff stopped receiving disability benefits as of that date. (*See* Supp. D'Ablemont Decl. Ex. C.) This evidence is not inconsistent with Plaintiff's contention now that Defendant should have restored him to his job as of February 18, 2013.[18]

Accordingly, the Court declines to find that Plaintiff is judicially estopped from asserting his FMLA (and NYCHRL) claims.

## II.    The FMLA

The Court turns now to Plaintiff's claims under the FMLA. Plaintiff contends that, because Defendant failed to restore him to his same, or an equivalent, position when he sought to return to work on multiple occasions following his November 26, 2012 injury, Defendant has impermissibly interfered with, restrained, and/or denied the exercise of Plaintiff's rights under the FMLA. (*See, e.g.*, Pl. Mot. at 17–21; Pl. Opp. at 1, 9–12.)

Defendant's principal response is that Defendant had a policy, of which Plaintiff was aware, requiring that any sales representative seeking to return from medical leave had to furnish Defendant with a medical certification stating that the employee could return to full duty without

---

[18] The Court's conclusion is reinforced by the fact that the private insurer's disability form placed the onus of notification of the "[e]mployee['s] return[] to work after the submission of this [disability] form" upon Defendant as the employer, and not upon Plaintiff. (D'Ablemont Decl. Ex. 12 at ECF 5; Pl. Opp. at 22; *see also* D'Ablemont Decl. Ex. 18 (asking employer whether employee was "still off work because of disability" and, "[i]f [employee] is working, when did [they] first resume work").) In light of this, it would have been reasonable for Plaintiff to assume that Defendant would notify the insurer of his return to work and that his disability benefits would cease upon his return. *Cf. Simon*, 128 F.3d at 73 (noting that plaintiff "was required to notify the Social Security Administration if he went to work after he signed" the disability forms at issue).

restrictions.  (*See, e.g.,* Def. Mot. at 5–7; Def. Opp. at 1.)  This argument, however, is based on a fundamental misunderstanding of the FMLA's requirements.

A.    Legal Standard

Based on its finding, *inter alia*, that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods," 29 U.S.C. § 2601(a)(4), Congress passed the FMLA "to entitle employees to take reasonable leave for medical reasons," *id.* § 2601(b)(2), "in a manner that accommodates the legitimate interests of employers," *id.* § 2601(b)(3).  In furtherance of that goal, the FMLA entitles eligible employees to a total of 12 workweeks of leave during any 12-month period because of, *inter alia*, a "serious health condition[19] that makes the employee unable to perform the functions of [his or her] position . . . ."  *Id.* § 2612(a)(1); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006).  Upon return from such leave, employees are entitled to be restored to the same, or an equivalent, position.  29 U.S.C. § 2614(a)(1); *see also Sista* at 174.

However, an employer is not required to restore an employee who is unable to perform the essential functions of his job.  (*See* 29 C.F.R. § 825.216(c);[20] *see also* Def. Reply at 7.)  As a condition of restoring an employee who has taken FMLA leave, "an employer may have a uniformly-applied policy or practice that requires all similarly-situated employees . . . who take leave . . . to obtain and present certification from the employee's health care provider that the employee is able to resume work" (the "standard" fitness-for-duty certification).  29 C.F.R. §

---

[19] A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).

[20] These regulations are "promulgated pursuant to the FMLA," and help define what constitutes an FMLA interference claim.  *See Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir. 2004) (citing 29 C.F.R. § 825.220(b)).

825.312(a).

"If the employer will require the employee to present a fitness-for-duty certification to be restored to employment, the employer must provide notice of such requirement," along with a notice designating the leave as FMLA leave ("designation notice"). *Id*. § 825.300(d)(3). The designation notice and the accompanying notice of a fitness-for-duty certification requirement must be in writing[21] and must be provided to the employee within five business days of the employer having "enough information to determine whether the leave is being taken for a FMLA-qualifying reason." *Id*. § 825.300(d)(1), (4).

The employer "may require that the certification specifically address the employee's ability to perform the essential functions of the employee's job" (the "specific" fitness-for-duty certification), but if that is the requirement, the employer "must provide an employee with a list of the essential functions of the employee's job no later than with the designation notice." *Id*. § 825.312(b). The regulations repeat this specific fitness-for-duty certification notice requirement multiple times. *See, e.g., id*. § 825.300(d)(3) ("If the employer will require that the fitness-for-duty certification address the employee's ability to perform the essential functions of the employee's position, the employer must so indicate in the designation notice, and must include a list of the essential functions of the employee's position."); *id*. § 825.312(d) ("The designation notice . . . shall advise the employee if the employer will require a fitness-for-duty certification to

---

[21] The employer "is not required to provide *written* notice of the [fitness-for-duty certification] requirement with the designation notice" if an "employer handbook or other written documents . . . describing the employer's leave policies clearly provide that a fitness-for-duty certification will be required in specific circumstances (*e.g.*, by stating that a fitness-for-duty certification will be required in all cases of back injuries for employees in a certain occupation)." 29 C.F.R. § 825.300(d)(3) (emphasis added). Even then, though, the employer "must provide *oral* notice [of the fitness-for-duty certification requirement] no later than with the designation notice." *Id*. (emphasis added).

return to work and whether that fitness-for-duty certification must address the employee's ability to perform the essential functions of the employee's job."). Thus, the regulations make clear that an employer can only condition an employee's return to work on a fitness-for-duty certification—general or specific—if it has provided notice of that requirement to the employee in a timely manner, and, in the case of a specific fitness-for-duty certification, only if the employer provided with the designation notice a list of the essential functions of the employee's position.

The employer may only "delay restoration to employment until an employee submits a required fitness-for-duty certification" if it has provided the notice required by the implementing regulations. *Id.* § 825.312(e). Failure to follow the notice requirements set forth in the FMLA regulations may form the basis of an FMLA interference claim and may subject an employer to liability for, *inter alia*, "compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment[ or] reinstatement . . . ." *Id.* § 825.300(e); *see also Fernandez v. Windmill Distrib. Co.*, No. 12-CV-1968, 2016 U.S. Dist. LEXIS 13680, at *20–21 (S.D.N.Y. Feb. 4, 2016) ("[T]he failure to provide notice that inhibits or restricts an employee from successfully obtaining leave or the right to reinstatement does result in a denial of benefits and can result in a cause of action for interference."); *Powell v. Metro One Loss Prevention Servs. Grp.*, No. 12 Civ. 4221, 2013 U.S. Dist. LEXIS 111601, at *25 (S.D.N.Y. July 26, 2013) ("Courts have broadly held that an employer's failure to comply with the FMLA's notification requirements will give rise to an FMLA interference claim, where prejudice to the employee can be shown to have arisen from the failure.").

B.    Plaintiff's FMLA Interference Claim

Employers covered by the FMLA may not interfere with, restrain, or deny an employee's

rights under the Act. 29 U.S.C. § 2615(a).[22] Eligible employees are entitled to bring a private of action to seek money damages and equitable relief for violations of the Act—a so-called "FMLA interference claim." *Id.* § 2617(a).

To prevail on his FMLA interference claim, Plaintiff must establish that: (1) he is an eligible employee under the FMLA; 2) Defendant is an employer as defined by the FMLA; 3) Plaintiff was entitled to take FMLA leave; 4) Plaintiff gave notice to Defendant of his intention to take leave; and 5) Plaintiff was denied benefits to which he was entitled under the FMLA. *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). There is no dispute the first four elements are met: Plaintiff is an eligible employee under the FMLA; Defendant is an employer subject to the FMLA;[23] Plaintiff was entitled to take FMLA leave; and Defendant was put on notice of Plaintiff's intention to take FMLA leave.[24] Therefore, the Court's analysis focuses on the one

---

[22] The FMLA applies to employers who "engage[] in commerce or in any industry or activity affecting commerce" and "employ[] 50 or more employees for each working day" in at least 20 weeks in the current or preceding calendar year. 29 U.S.C. § 2611(4)(A). An "eligible employee" is one who has been employed for at least 12 months by, and who has worked at least 1,250 hours for, the employer from whom the employee requests leave. *Id.* § 2611(2)(A).

[23] To be covered by the FMLA, an employer must employ at least 50 individuals. 29 U.S.C. § 2611(4)(A). Neither party states in their respective Rule 56.1 Statements facts regarding the number of people employed by Defendant, and while Plaintiff asserts that Defendant is a covered employer in his motion for summary judgment (*see* Pl. Mot. at 15), he cites only portions of his own deposition testimony in which he testified, not as to the number of individuals Defendant employs, but rather as to the *types* of workers Defendant employs, *i.e.*, "truck drivers, . . . [w]arehouse m[e]n, . . . and salespeople" (Reyes Dep. at 39:1–40:12). Nevertheless, the Court treats this fact as undisputed, for two reasons: First, Defendant proffers multiple undisputed facts indicating its compliance with, and implicitly its coverage by, the FMLA. (*See, e.g.*, Def. 56.1 ¶ 9.) Second, Defendant has not challenged this claim, and the Court therefore deems any such challenge as having been abandoned. *See Jackson v. Fed. Express*, 766 F.3d 189, 196–98 (2d Cir. 2014) (finding it "appropriate," particularly where party is represented by counsel, to "infer from [the party]'s partial opposition that [the] claims . . . that are not defended have been abandoned," since "[g]enerally . . . a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others").

[24] Defendant appears to argue that Plaintiff failed to comply with the employee notice

22

disputed element of Plaintiff's FMLA interference claim—whether Plaintiff was denied benefits to which he was entitled under the FMLA, namely, restoration to his prior position or an equivalent one upon the end of his FMLA leave.

### C. Requisite Notice and Timing Thereof

Defendant argues that its failure to restore Plaintiff to his previous, or an equivalent, position did not violate the FMLA, because Plaintiff failed to provide compliant medical certification of his "fitness-for-duty," insofar as the medical certifications he submitted did not state explicitly that he could return to full duty without restrictions. Plaintiff argues that such an explicit statement is not required by the FMLA or its implementing regulations, and to the extent an employer may require such an explicit statement, it may do so only under conditions not met here. The Court agrees and therefore denies Defendant's motion for summary judgment on Plaintiff's FMLA claim. But as discussed *infra*, the Court finds that there are disputed issues of fact regarding whether, and at what point, Plaintiff was able to perform the essential duties of his job, and therefore denies Plaintiff's motion for summary judgment on that claim, as well.

---

requirements of the FMLA, specifically because the FMLA package he picked up in November 2012 required him to return the forms therein within two weeks and, Defendant asserts, Plaintiff only returned them on "December 26, 2012 or shortly thereafter." (Def. Mot. at 16; *see also* Def. Opp. at 12.) But it is undisputed that, on November 26, 2012, Plaintiff's supervisor was informed of Plaintiff's accident (Pl. 56.1 ¶ 11; Supp. D'Ablemont Decl. Ex. E at 41:5–20), and that, "[o]n November 27, 2012, Plaintiff applied for and received the U.S. Department of Labor ('DOL') FMLA package," and that "[h]is twelve (12) workweek protected period ended on Friday, February 15, 2013." (Def. 56.1 ¶ 9.) This is sufficient under the "relaxed" and "practical" notice standard that applies to unforeseeable FMLA leave, which requires only that "an employee [] provide notice to the employer as soon as practicable when considering all of the facts and circumstances of the situation." *Mehmeti v. Jofaz Transp., Inc.*, No. 15-2609, 2016 U.S. App. LEXIS 9343, at *3 (2d. Cir. May 23, 2016) (summary order) (quotation marks omitted) (alteration omitted); *see also Millea v. Metro-North R.R.*, 658 F.3d 154, 161–62 (2d Cir. 2011). Furthermore, it is undisputed that Defendant characterized Plaintiff's leave as FMLA leave and that, other than these allusions to Plaintiff's delay in returning paperwork, nowhere in Defendant's papers does it raise the argument that Plaintiff's notice regarding his injury and his need to take FMLA leave was insufficient under 29 C.F.R. § 825.303.

As previously discussed, under the FMLA, Defendant was permitted to require Plaintiff "to obtain and present certification from [his doctor] that [Plaintiff] [wa]s able to resume work" before allowing him to return to the same or an equivalent position. 29 C.F.R. § 825.312(a). However, even as to this *standard* fitness-for-duty certification requirement, Defendant had to provide Plaintiff notice of the requirement no later than with the designation notice, *i.e.* within five business days of having enough information to determine whether the leave was being taken for a FMLA-qualifying reason. *See id.* §§ 825.300(d)(1), (3); 825.312(d).[25] And to the extent Defendant sought to require a *specific* fitness-for-duty certification, it had to, within the same timeframe, both notify Plaintiff of that requirement and "provide [Plaintiff] with a list of the essential functions of the employee's job." *Id.* § 825.312(b). *See also* 73 Fed. Reg. 67934, 68030 (Nov. 17, 2008) (FMLA implementing regulations modified "to provide that, if the employer will require a fitness-for-duty certification, the employer must advise the employee of this requirement in the designation notice and indicate therein whether that certification must address the employee's ability to perform the essential functions of the employee's job.").

Plaintiff notified Defendant of his accident on November 26, 2012, and picked up an

---

[25] Indeed, Defendant does not appear to have even provided the requisite written notice designating Plaintiff's leave as FMLA-qualifying, as required under the FMLA. *See* 29 C.F.R. § 825.300(d)(1), (4) ("The employer is responsible in all circumstances for designating leave as FMLA-qualifying, and for giving notice of the designation to the employee . . . within five business days" of "ha[ving] enough information to determine whether the leave is being taken for a FMLA-qualifying reason," and the notice "must be in writing"). This failure to provide the requisite notice to Plaintiff that his leave after his November 26, 2012 accident was FMLA-qualifying, in itself, "may constitute an interference with, restraint, or denial of the exercise of [Plaintiff's] FMLA rights." *Id.* § 825.300(e). But because neither party disputes that, in fact, Plaintiff's leave was FMLA-qualifying and, implicit in the parties' respective Rule 56.1 Statements and the materials cited therein, both parties were aware that Plaintiff's leave was being considered FMLA leave, the Court has focused its analysis on the additional defect of Defendant having failed to provide any notice regarding a fitness-for-duty certification being required for Plaintiff to return to work. (*See, e.g.*, Def. 56.1 ¶ 9; Pl. 56.1 ¶ 12; D'Ablemont Decl. Ex. 1 (Defendant made Plaintiff aware of his entitlement to 12 weeks of FMLA leave on the day of Plaintiff's accident).)

FMLA package the next day.  (Pl. 56.1 ¶ 11; Def. 56.1 ¶ 9; Supp. D'Ablemont Decl. Ex. E at 41:5–20.)  The requisite notice should therefore have been provided to Plaintiff by December 4, 2012. Even if Plaintiff's conduct in November 2012 did not furnish Defendant with enough information to determine whether his leave was FMLA-qualifying, certainly when Plaintiff submitted the FMLA paperwork with Dr. Horowitz's medical evaluation "on December 26, 2012 or shortly thereafter" (Def. Mot. at 16) Defendant had sufficient information to do so.  Giving Defendant the benefit of the doubt that the first business day after Plaintiff's submission of the FMLA paperwork was as late as January 2, 2013, Defendant would have been required to provide Plaintiff with a designation notice, accompanied by notice of a fitness-for-duty certification (and, if specific, a list of essential job functions), by January 8, 2013.

There is no evidence in the record that Defendant provided the requisite notice, even by the later date of January 8, 2013, and even as to the *standard* fitness-for-duty certification. Certainly there is no evidence in the record suggesting that Defendant provided Plaintiff with notice of a *specific* fitness-for-duty certification requirement by January 8, 2013 or at any time thereafter.   Because Defendant failed to provide notice of *any* fitness-for-duty certification requirement, it was precluded from requiring *any* type of fitness-for-duty certification as a condition of restoring Plaintiff.  *Powell*, 2013 U.S. Dist. LEXIS 111601, at *22 ("If . . . Defendant [employer] failed to make a timely, written request [for] a fitness-for-[duty] certification . . . then Defendant was not entitled to require such a certification when Plaintiff's FMLA leave ended"). Defendant also was not permitted to delay restoring Plaintiff to employment pending the submission of any fitness-for-duty certification.  *See* 29 C.F.R. § 825.312(e) ("An employer may delay restoration to employment until an employee submits a required fitness-for-duty certification *unless the employer has failed to provide the notice required . . . .*"); *see also Powell*, 2013 U.S.

Dist. LEXIS 111601, at *19 ("An employer may delay or deny an employee's reinstatement for failure to provide a fitness-for-duty certification only if, in accordance with the regulations, the employer requested such a certification when it initially notified the employee that he was being placed on FMLA leave.").

In arguing for summary judgment, Defendant seemingly ignores these requirements, instead relying on a Third Circuit case, *Budhun v. Reading Hospital & Medical Center*, 765 F.3d 245 (3d Cir. 2014), for the proposition that "[i]f Plaintiff had not obtained from his physician during [his] 12 workweek [FMLA leave] period a medical certification that Plaintiff had recovered from his serious health condition to a degree that he was now physically capable of performing the essential duties of his sales representative position without restrictions, then . . . with or without a replacement, Plaintiff's job protection would be lost and his employment subject to termination with the loss of his FMLA protection." (Def. Mot. at 11; Def. Opp. at 20.)  Not only is *Budhun* not binding upon this Court, but the Third Circuit's conclusions in that case undermine Defendant's position:  the Third Circuit stated explicitly that "[a]n employer may require that [a fitness-for-duty] certification address the employee's ability to perform the essential functions of her job, *but only if the employer provides a list of essential functions to the employee at the time that the employer notices the employee that she is eligible for FMLA leave.*"  *Budhun*, 765 F.3d at 253 (emphasis added).   Indeed, based in part on the fact that the defendant employer "undisputed[ly] "did not provide [plaintiff] with such a list," the Third Circuit vacated the district court's grant of summary judgment in favor of the employer on the plaintiff's FMLA interference claim.  *See id.* at 253–54.[26]

_____

[26] To the extent the Third Circuit's decision in *Budhun* can be read as permitting an employer to require a specific fitness-for-duty certification without providing the employee written notice of such a requirement and a list of essential functions within the time limits prescribed by

1.      <u>Defendant's Policy Requiring Fitness-for-Duty Certification</u>

Defendant seems to argue that any notice requirement was satisfied by the alleged existence of a "policy" requiring all sales representatives who have taken leave to obtain "a medical certificate that he . . . is physically capable to return to work *full duty* so as to be able to perform the essential duties of the job *without any restrictions*." (Def. Opp. at 1 (emphases added).) But nowhere does the FMLA or its regulations permit this type of general policy to serve as the requisite notice of the *standard* fitness-for-duty certification, let alone the *specific* fitness-for-duty certification. Rather, as previously discussed, the regulations only permit an employer not to comply with the notice requirements for the *standard* fitness-for-duty certification if "the employer handbook or other *written* documents . . . describing the employer's leave policies clearly provide that a fitness-for-duty certification will be required in specific circumstances (*e.g.,* by stating that fitness-for-duty certification will be required in all cases of back injuries for employees in a certain occupation)." *See* 29 C.F.R. § 825.300(d)(3) (emphasis added). There is no evidence in the record that any such written "policy" existed here. Even if there were, Defendant still would have had to "provide *oral* notice [of the certification requirement in the written policy] no later than with the designation notice,"[27] *id*. (emphasis added), and there is no evidence in the record that any such oral notice was provided.

Even assuming that Defendant's "policy" provided sufficient notice of a *standard* fitness-for-duty certification requirement, Plaintiff's February 5, 2013 medical evaluation and his

---

the FMLA regulations, the Court respectfully disagrees with this conclusion as contrary to the express language of the FMLA regulations. *See* 29 C.F.R. §§ 825.300(d)(3), 825.312(b), (d).

[27] As previously discussed, the designation notice should have been provided to Plaintiff by January 8, 2013. *See supra* at 25.

February 7, 2013[28] letter expressing his intent to return to work were sufficient to satisfy that requirement, since, as discussed *infra*, Plaintiff's restricted activities as certified by his doctors were not "essential functions" of his position. *See* 29 C.F.R. § 825.312(a) (standard fitness-for-duty certification need only state that "employee is able to resume work").

---

[28] Plaintiff claims that he sought to return to work on at least three occasions: December 26, 2012, February 5 or 7, 2013, and March 5 or 6, 2013. (*See, e.g.,* Pl. Mot. at 18–21; Pl. Opp at 2–3, 11–13.) The Court's analysis focuses on the February 5 or 7, 2013 dates. On December 26, 2012, Plaintiff voluntarily supplied a medical evaluation stating that he was "unable to perform *any* of his[] job functions due to the [serious health] condition" resulting from his accident. (D'Ablemont Decl. Ex. 10 at ECF 5.) While it is true that Defendant, having failed to provide Plaintiff with the requisite notice of any fitness-for-duty certification, could not have required Plaintiff to provide such medical certification as a condition of restoration, Plaintiff voluntarily submitted that medical evaluation at the time he alleges he first attempted to return to work. The FMLA's requirements cannot be read as requiring an employer to *ignore* a medical certification attesting to an employee's lack of fitness for duty that is voluntarily provided by an employee seeking to return to work. And Plaintiff's attempt to return to work on March 5 or 6, 2013 date undisputedly falls outside Plaintiff's FMLA leave period. (*See* Def. 56.1 ¶ 9; Pl. Opp. 56.1 ¶ 9.)

However, the Court's conclusions regarding the February 5, 2013 medical evaluation and February 7, 2013 letter indicating Plaintiff's intent to return would apply equally to February 18, 2013, the first full workday after the end of Plaintiff's FMLA leave. While Defendant argues that Plaintiff did not request his job back on that day, but rather, began receiving unemployment compensation payments of $405 per week, and in fact, made no subsequent requests to return to work after February 7, 2013 (Def. 56.1 ¶¶ 30, 38), Defendant has failed to demonstrate that Plaintiff was required to make such an explicit request.

The FMLA stipulates that "[a]n employer *may* require an employee on FMLA leave to report periodically on the employee's . . . intent to return to work," 29 C.F.R. § 825.311(a) (emphasis added), but the employer's "obligations [under the FMLA] continue if an employee indicates he . . . may be unable to return to work but expresses a continuing desire to do so," *id.* § 825.311(b). There is no evidence in the record that Defendant required its employees to periodically report on their intent to return to work from FMLA leave. And Plaintiff's expressions of his intent to return to work, both on December 26, 2012 and on February 7, 2012, imposed a continuing obligation on Defendant to comply with the FMLA's provisions, *id.*, including returning Plaintiff to "the same position [he] held when leave commenced, or to an equivalent position, . . . even if [Plaintiff] ha[d] been replaced or his . . . position ha[d] been restructured to accommodate [his] absence," *id.* § 825.214. Indeed, the record evidence makes clear that Defendant was aware of Plaintiff's intention to return to work as of February 18, 2013, as Defendant's "Director HR" Sgro signed a disability form on February 7, 2013, which stated in the "Claimant's Statement" section that Plaintiff "expect[ed] to return to work" on February 18. (*See* D'Ablemont Decl. Ex. 18 (Plaintiff mistakenly listed 2012 as year in both his expected return date and his date of signature, but both Sgro's signature and physician's signature on form were dated 2013).)

Furthermore, even if Defendant's alleged general policy regarding medical certification suffced to provide the requisite notice of the *standard* fitness-for-duty certification requirement, it still would not satisfy the FMLA's *specific* fitness-for-duty certification notice requirement. The latter required Defendant to "provide [Plaintiff] with a list of the essential functions of the employee's job no later than with the designation notice required by § 825.300(d)," *id.* § 825.312(b), and to indicate in the designation notice that the medical certification "must address the employee's ability to perform the essential functions of the employee's job," *id.* § 825.312(d). *See also* 73 Fed. Reg. 67934, 68030 (Nov. 17, 2008). There is no evidence that Defendant provided any such notice of the specific fitness-for-duty certification requirement by the applicable deadline of January 8, 2013. *See supra* at 25. Thus, the Court rejects Defendant's argument that the FMLA's notice requirements were satisfied by Defendant's purported "policy" requiring medical certifications attesting to the employee's ability to return to full duty and perform the essential duties of his/her job without restrictions.

2.    <u>January 25, 2013 Letter and Job Description</u>

Defendant also argues that it satisfied both the standard and specific fitness-for-duty certification notice requirements with its January 25, 2013 letter to Plaintiff's doctors, which was accompanied by Plaintiff's job description. (*See, e.g.*, Def. Mot. at 6, 12–13.) The Court disagrees. It is beyond dispute that this notice was untimely, coming more than two weeks after the latest possible date any such notice should have been provided. *See supra* 25. For this reason alone, Defendant will not be permitted to argue at trial that the January 25, 2013 letter constitutes notice of any fitness-for-duty certification requirement under the FMLA.[29]

---

[29] Though academic in light of the Court's finding of untimeliness, it is far from clear that the January 25, 2013 letter "indicate[s] . . . that the [medical] certification must address [Plaintiff's] ability to perform those essential functions" listed in the accompanying job description. *See* 29

### 3. Prolonged Walking or Standing Are Not Essential Functions

Although not necessary to the Court's decision, for purposes of trial, the Court finds that there is no genuine factual dispute regarding whether "prolonged walking or standing"—the only physical restrictions certified by Plaintiff's doctors at issue here—were "essential functions" of Plaintiff's job as an On Premises Sales Representative for Defendant. They were not.

While neither the FMLA nor its implementing regulations define "essential function," Second Circuit case law interpreting that term in the context of the ADA is instructive. *See, e.g., Daley v. Cablevision Sys. Corp.*, No. 12-CV-6316, 2016 U.S. Dist. LEXIS 28885, at \*23–24 (S.D.N.Y. Mar. 7, 2016) (granting summary judgment in favor of defendant on plaintiff's FMLA claim on the basis, *inter alia*, of plaintiff's admissions, as to his ADA claims, that he could not perform essential functions of the job). As per these cases, "[e]ssential functions constitute 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Daley*, 2016 U.S. Dist. LEXIS 28885, at \*13 (quotation marks omitted). "Although a court will give considerable deference to an employer's determination as to what functions are

---

C.F.R. § 825.312(b). In the January 25, 2013 letter from Sgro to Dr. Horowitz, the only instruction provided to Plaintiff's doctor was to "review the job description and advise [Defendant] of any restricted physical activity at [the doctor's] earliest convenience." (D'Ablemont Decl. Ex. 4.) If, as Defendant's own cited case law states, "the onus [is] on an employee's health care provider – not her employer – to certify whether the employee is unable to perform any essential function of her job," *Budhun*, 765 F.3d at 254, it is appropriate to interpret the FMLA regulations as requiring an employer to give the healthcare provider more explicit notice that his or her certification should address an employee's ability to engage in the specific activities set forth in the accompanying list of job functions.

Here, the January 25, 2013 letter ambiguously requested that Plaintiff's doctor inform Defendant of "any restricted physical activity," instead of directing the doctor to specifically evaluate and certify whether Plaintiff could perform the functions listed in the job description. Thus, as in *Budhun*, it was *Defendant's* "unilateral[] determin[ation]" that Plaintiff "could not perform an essential function" of his position, rather than the evaluation of Plaintiff's doctor, that caused Defendant to refuse to reinstate Plaintiff to his same, or an equivalent, position. *Id*. at 255 (vacating summary judgment that had been rendered in employer's favor).

essential, there are a number of relevant factors that may influence a court's ultimate conclusion as to a position's essential functions." *McMillan v. City of N.Y.*, 711 F.3d 120, 126 (2d Cir. 2013). These factors include, among other things, whether "the reason the position exists is to perform that function," whether there are only "[a] limited number of employees available among whom the performance of that job function can be distributed," and whether "[t]he function [is] highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Stone v. City of Mt. Vernon*, 118 F.3d 92, 97 (2d Cir. 1997). In undertaking this "fact-intensive" inquiry of "whether a particular function is essential," courts will consider evidence such as "[t]he employer's judgment as to which functions are essential," "[w]ritten job descriptions" of the job in question, "[t]he amount of time spent on the job performing the function," "[t]he consequences of not requiring the incumbent to perform the function," "[t]he work experience of past incumbents in the job," and "[t]he current work experience of incumbents in similar jobs." *Id.*

Defendant claims that prolonged standing and walking were essential functions of Plaintiff's job as a sales representative. (*See, e.g.*, Def. Mot. at 7.)  It is undisputed that Plaintiff would either drive from one account establishment to the next and walk from his car into each one, or park his car and walk between the establishments (Pl. 56.1 ¶ 4; Def. 56.1 ¶ 5); that he would walk to the nearest Chase ATM to deposit cash and checks from his customer accounts (Def. 56.1 ¶ 5; Def. Opp. 56.1 ¶ 4; Pl. 56.1 ¶ 5); that he would pick up POS materials from Defendant's headquarters, load them into his car, and then remove them from his car and place them in prominent locations at each account location (Def. 56.1 ¶ 6; Def. Opp. 56.1 ¶ 4); and that on certain Fridays, he would push and pull a 40-pound sample taste kit on wheels into non-customer establishments in his territory (Def. 56.1 ¶ 7; Def. Opp. 56.1 ¶ 4).  However, neither this evidence,

nor any other evidence in the record, establishes that "prolonged walking or standing" were essential functions of Plaintiff's position. Rather, the record makes clear that these were, at most, marginal functions thereof.

Tellingly, the "complete [job] description" provided to Plaintiff's doctor by Sgro (D'Ablemont Decl. Ex. 4) does not mention or even implicate walking, standing, or any other physical skills or abilities. Rather, the emphasis in the description is on customer service-oriented functions. "Key Activities" of the sales representative position include, *inter alia*, "report[ing] daily to his/her supervisor in order to communicate all relevant market and customer information," "utiliz[ing] his/her PDA to complete and maintain all records of activities . . . ," "cover[ing] his route itinerary in calling on his/her customers according to company standards, service policy and customer standards," "[e]xecut[ing] Company POS in line with prescribed company and supplier standards/requirements," "[c]ollect[ing] [c]ash" and managing "[b]ounced [c]hecks" and "delinquent accounts," "[s]triv[ing] to achieve Sales and Distribution goals set by manager by executing company portolio in buy and non-buy accounts," and "[r]espond[ing] immediately to potential product refusals, to avoid missed delivery issues and ensure timely merchandising to maximize customer satisfaction." (*Id*. Ex. 5 at 1.) Similarly, the "Required Knowledge/Skills/Abilities" section includes only "Industry knowledge," "Product/Brand Knowledge," "Business Math skills," "Customer Service skills," "Selling Skills/techniques," "Interpersonal (relationship building) skills," "Oral and written communication skills," "Computer skills," and "Time management/Organization." (*Id*. Ex. 5 at 2.) (*See also id*. Ex. 10 at ECF 4 (in employer section of FMLA package, listing only "[d]riving" as "[e]mployee's essential job functions"); *id*. Ex. 12 at ECF 5 ("Employer's Statement" section of short-term disability form left blank where it requests designation of "the strength demand . . . which best describes the

Employee's job").)

The only evidence cited by Defendant to support the allegedly undisputed fact that "[p]rolonged walking and standing are the primary essential duties of Plaintiff's sales representative position" is the deposition testimony of Tierno, Plaintiff's supervisor.  (Def. 56.1 ¶ 27.)[30]  But the sum total of that cited testimony consists of the following exchange:

> Q. Could Mr. Reyes have performed his responsibilities as a sales rep without prolonged sitting?
>
> A. Without prolong [sic] sitting?
>
> Q. Yes.
>
> [Defendant's counsel]. Do you understand the question?
>
> A. Without prolonged sitting, he would have to be walking an awful lot so he could not sit really.

(D'Ablemont Decl. Ex. 19 at 81:2–11.)  No reasonable jury could conclude, on the basis of this unilluminating and confused testimony, that either prolonged walking or standing were essential duties of Plaintiff's job as a sales representative, particularly not in light of the duties and skills set forth in Defendant's written job description.  Indeed, the most physical aspect of Plaintiff's job, as described by Defendant, seems to be the process of loading potentially heavy POS items into and out of Plaintiff's car (Def. 56.1 ¶ 6; Def. Opp. 56.1 ¶ 4), and pushing and pulling an approximately 40-pound sample taste kit on wheels to and from Plaintiff's car and non-customer establishments

---

[30] Defendant also cites "Ex. 20 at 79:25-82:25" in support of its assertion that "[p]rolonged walking and standing are the primary essential duties of the sales rep position."  (Def. Opp. 56.1 ¶ 18.)  According to D'Ablemont's declaration, Exhibit 20 is a copy of excerpts from Tierno's deposition testimony, while Exhibit 19 is a copy of excerpts from Fiorenza's deposition testimony.  (*See* D'Ablemont Decl. at 3.)  In fact, however, Exhibit 19 is a copy of Tierno's deposition excerpts, whereas Exhibit 20 is a copy of Fiorenza's deposition excerpts, and neither exhibit contains the referenced page range (79:25-82:25).  The Court's review of both sets of those deposition excerpts, as well as additional excerpts attached as Exhibit E (Tierno) and Exhibit F (Fiorenza) to D'Ablemont's supplemental declaration, reveals no testimony other than that quoted above relevant to the issue of walking or standing as essential duties of Plaintiff's job.

(Def. 56.1 ¶ 7; Def. Opp. 56.1 ¶ 4).[31] *Cf. Daley*, 2016 U.S. Dist. LEXIS 28885, at *14–15 (finding plaintiff unable to perform essential functions of his position where his job responsibilities "included traveling to customers' residences; maneuvering a twenty-foot, 85-90 pound ladder; accessing [cable] equipment on the sides or roofs of homes; and jumping fences and climbing trees," such that "[p]laintiff himself admitted that his job was 'very physical,'" and plaintiff "suffered from muscle spasms, ha[d] not regained full use of his shoulder, [wa]s in continuous pain, and [could not] work").

Thus, the record makes clear that prolonged walking and standing were at best marginal, rather than essential, functions of Plaintiff's job. At trial, Defendant will be precluded from arguing that these activities were essential functions of Plaintiff's position as a sales representative.

### 4. Factual Dispute as to Whether Plaintiff Remained Otherwise Unable to Perform Essential Functions

However, despite Defendant's failure to comply with the FMLA's notice requirements and the undisputed fact that prolonged walking and standing were not essential functions of Plaintiff's position, the Court cannot grant summary judgment in Plaintiff's favor, as there exist genuine issues of material fact as to whether Plaintiff was nonetheless able to perform the essential functions of his job at the time his FMLA leave expired on February 18, 2013. If not, Defendant was not required by the FMLA to reinstate him to his former, or an equivalent, position. *See* 29 C.F.R. § 825.216(c) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition

---

[31] The Court notes that the medical evidence proffered by the parties indicates that, while Plaintiff's initial medical evaluation in the FMLA package assessed that he was "unable to perform [h]eavy lifting," "bending," "pushing," "pulling," and "prolonged sitting/standing > 1–2 hours" (D'Ablemont Decl. Ex. 10 at ECF 5), his February 5, 2013 evaluation restricted only "prolonged walking or standing, running or jumping," and no longer restricted his "[h]eavy lifting," "pushing," or "pulling" activities (*id*. Ex. 6).

. . . , the employee has no right to restoration to another position under the FMLA."). The Second Circuit has held that "[a] right to receive notice is not a right that the intended recipient of the notice 'exercises'" and has "decline[d] to interpret the FMLA as giving an employee a right to sue the employer for failing to give notice of the terms of the [FMLA] where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the [FMLA]." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161–62 (2d Cir. 1999) (affirming grant of summary judgment in employer's favor on plaintiff's FMLA interference claim because "[t]he fact that [plaintiff] was not restored to his position at the end of that 12-week period [of FMLA leave] did not infringe his FMLA rights," since it was "undisputed that at the end of that period he remained unable to perform the essential functions of his [] position").

Evidence in the record—albeit post-dating the expiration of Plaintiff's FMLA leave on February 18, 2013—creates a factual dispute as to whether Plaintiff was, in fact, able to return to work and perform the essential functions of his job on that date. The April 4, 2013 letter from Plaintiff's doctor stated that Plaintiff "was unable to work from 11/26/2012 till 2/25/2013." (*See* D'Ablemont Decl. Ex. 16.) The March 5, 2013 certificate of Plaintiff's doctor stated that Plaintiff "will be able to resume work" on "3/6/13." (*See id*. Ex. 18;[32] *see also* Def. 56.1 ¶¶ 31, 33.)[33] In response to these documents, Plaintiff relies entirely on an alleged conversation he had with Sgro on February 7, 2013—eleven days before the expiration of Plaintiff's FMLA leave period—in which Sgro told Plaintiff that a new position would be created for him. (*See* Pl. Opp. 56.1 ¶ 31 ("Plaintiff was able to work on February 26, 2013, three weeks from the date Angelo Sgro

---

[32] *See supra* fn.13 regarding D'Ablemont Decl. Ex. 18.

[33] These two letters contradict Dr. Winiarsky's February 5, 2013 letter opining that Plaintiff could "return to work full time," except that he should refrain from "prolonged walking or standing, running or jumping." (D'Ablemont Decl. Ex. 6.)

promised Plaintiff a new position."); *id*. ¶ 33 ("March 6, 2013 was four weeks from February 7, 2013, which is the date of [Plaintiff's] discussion with Angelo Sgro . . . [in which] Sgro told [Plaintiff] that a new position would be created for him within three . . . or four weeks . . . .").) However, this response does not address the fundamental question of whether, as the doctors opined in their letters, Plaintiff remained unable to work even after his FMLA leave expired, or whether, as Plaintiff now intimates, the doctors' evaluations were phrased in this way to reflect the content of Plaintiff's February 7, 2013 conversation with Sgro, during which it was allegedly agreed that Plaintiff would return to work within three to four weeks of the February 7, 2013 conversation—on February 26, 2013 or March 6, 2013, respectively.  (*Compare* Pl. Opp. 56.1 ¶¶ 31, 33, *with* Supp. D'Ablemont Decl. Ex. A ¶¶ 6–8, 10.)[34]

Accordingly, because of the remaining factual dispute regarding Plaintiff's actual ability to perform his essential job functions as of February 18, 2013, the Court denies Plaintiff's summary judgment motion on his FMLA claim.

III.  NYCHRL

Plaintiff alleges that "under [the] NYCHRL, Defendant discriminated against [Plaintiff] when it did not allow [him] to return to his position when he was physically able to perform the essential functions of his job."  (Pl. Mot. at 1; *see also* Pl. Opp. at 1.)

To state a claim for disability discrimination under the NYCHRL, a plaintiff must show that: (1) his employer was subject to the NYCHRL; (2) he was disabled within the meaning of the NYCHRL; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability.  *See Kendall v. Fisse*, 149 F. App'x 19, 21 (2d Cir. 2005) (summary order); *see also*

_____

[34] *See supra* fn.10 regarding Supp. D'Ablemont Decl. Ex. A.

*Fernandez*, 2016 U.S. Dist. LEXIS 13680, at *27–28.  The only element in dispute here is the third

one:  whether Plaintiff was qualified to perform the essential functions of the job, with or without

reasonable accommodation.[35]  Because, as discussed above, there is a genuine issue of material

fact as to whether Plaintiff could, in fact, perform the essential functions of his job as of February

18, 2013,[36] the Court denies both parties' motions for summary judgment as to this claim.

At trial, however, Plaintiff will not be permitted to rest his NYCHRL claim on Defendant's

alleged failure to engage in a good faith interactive process to identify what reasonable

accommodations were appropriate to permit Plaintiff to return to work.  (*See, e.g.*, Pl. Mot. at 8;

Pl. Opp. at 5–7.)  As an initial matter, this claim fails because it is undisputed that Plaintiff did not

request a reasonable accommodation at the time Defendant refused to reinstate him, nor does he

seek one now; in fact, Plaintiff acknowledged on the record before the Court that his NYCHRL

claim is "based on Defendant's decision not to allow Plaintiff to return to his former job (when

---

[35] Defendant does not dispute that it is subject to the NYCHRL, nor is there any dispute that Plaintiff's termination, or constructive discharge, would constitute an adverse employment action.  *See Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir. 2004) (adverse employment actions include, *inter alia*, "termination of employment" or "a material loss of benefits").  There is also no dispute that Plaintiff, being restricted from prolonged walking or standing, was disabled under the NYCHRL.  *See, e.g., Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 253 (E.D.N.Y. 2015) (to constitute a disability, the NYCHRL requires only that Plaintiff had "any physical, medical, mental or psychological impairment, or a history or record of such impairment," which include, but are not limited to, problems with the musculoskeletal system) (citing N.Y.C. Admin. Code 8-102(16)(a), 8-102(16)(b)(1)) (quotation marks omitted); *see also Thomson v. Odyssey House*, No. 14-CV-3857, 2015 U.S. Dist. LEXIS 125887, at *56 (E.D.N.Y. Sept. 21, 2015) (NYCHRL has a "broader definition of 'disability' than does the ADA; [it does not] require[] any showing that the disability substantially limits a major life activity.") (quotation marks omitted).

[36] Plaintiff also claims that he was able to return to work as early as February 5, 2013, based on the letter of that date submitted by Dr. Winiarsky to Defendant certifying that Plaintiff could "return to work full time," excluding any "prolonged walking or standing, running or jumping."  (D'Ablemont Decl. Ex. 6.)  This fact is similarly in dispute because of the evaluations subsequently provided by Plaintiff's doctors on March 5 and April 4, 2013, indicating that Plaintiff would "be able to resume work" on "3/6/13," and was "unable to work" until "2/25/13," respectively.  (*See* D'Ablemont Decl. Exs. 16, 18.)

Plaintiff was physically able to perform the essential functions of his job)," rather than on the fact "that Defendant failed to accommodate Plaintiff's disability." (*See* 8/20/15 Minute Entry.)

Moreover, Plaintiff's argument that "the failure to engage in a good faith, individualized interactive process is itself a violation of the law and gives rise to an independent claim" (Pl. Opp. at 6) misstates the law. Indeed, the primary case upon which Plaintiff relies, and upon which the other cases cited by Plaintiff rely[37]—*Phillips v. City of New York*, 66 A.D.3d 170 (N.Y. App. Div. 2009)—has been overruled by more recent New York Court of Appeals authority: "[T]o the extent the . . . decision in *Phillips* can be interpreted as implying that a good faith interactive process is an independent element of the disability discrimination analysis under [the NYCHRL] which, if lacking, automatically compels a grant of summary judgment to the employee or a verdict in the employee's favor, we reject that notion." *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 11 N.E.3d 159, 169 (N.Y. 2014) (citation omitted).

Plaintiff attempts to characterize the holding in *Jacobsen* as "[o]verrul[ing] [*Phillips*] on other grounds . . . in that the failure to engage in the interactive process does not automatically

---

[37] In support of his argument that the failure to engage in the required good faith interactive process is sufficient to sustain his NYCHRL claim, Plaintiff cites at least three district court cases that appear to have also erroneously relied on *Phillips*. (Pl. Opp. at 6.) *See Stuart v. T-Mobile USA, Inc.*, No. 14-cv-4252, 2015 U.S. Dist. LEXIS 106155, at *27 (S.D.N.Y. Aug. 12, 2015) ("New York courts have held that the failure to engage in an interactive process is itself a violation of the law and gives rise to an independent claim.") (citing *Phillips*, 66 A.D.3d at 176); *LeBlanc v. UPS*, No. 11 Civ. 6983, 2014 U.S. Dist. LEXIS 50760, at *54 n.14 (S.D.N.Y. Apr. 11, 2014) ("Following the Second Department's decision in *Phillips*, several courts in New York State and in this Circuit found that, unlike the ADA, an employer's failure to engage in an 'interactive process' constituted an independent violation of the NYCHRL.") (citing *Phillips*, 66 A.D.3d 170); *Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 420 (S.D.N.Y. 2014) ("[U]nder the . . . NYCHRL, an employer's failure to engage in the interactive process is itself a violation of the law.") (citing *Phillips*, 66 A.D.3d at 176–77). *See also Thomson*, 2015 U.S. Dist. LEXIS 125887, at *57 ("'New York courts have held that the failure to engage in an interactive process is itself a violation of the law and gives rise to an independent claim.'") (citing *Stuart*, 2015 U.S. Dist. LEXIS 106155).

lead to summary judgment, but remains required for a defendant." (Pl. Opp. at 6 n.2.) But this characterization misstates the import of that decision, which holds that "the employee cannot obtain a favorable jury verdict or summary judgment solely based on the employer's failure to engage in an interactive process," and that "the employer's decision to engage in or forgo an interactive process *is but one factor to be considered* in deciding whether a reasonable accommodation was available for the employee's disability at the time the employee sought accommodation." *Jacobsen*, 11 N.E.3d at 169 (emphasis added). Indeed, one of Plaintiff's cited cases—*LeBlanc* (*see* Pl. Opp. at 6)—properly characterized the *Jacobsen* decision as "limit[ing] *Phillips*, in holding that [] an employer's failure to engage in an interactive process is not a *per se* violation of the NYCHRL, but is nonetheless an important consideration when evaluating a failure to accommodate claim." *LeBlanc*, 2014 U.S. Dist. LEXIS 50760, at *54 n.14 (citing *Jacobsen*, 11 N.E.3d 159).

Contrary to Plaintiff's argument, therefore, the failure to engage in a good faith individualized interactive process is *not* "itself a violation of the law" and does *not* "give[] rise to an independent claim." (*Cf.* Pl. Opp. at 6.) Rather, that failure is relevant to determining whether an employer violated the NYCHRL by failing to provide a reasonable accommodation for an employee's disability—the very argument Plaintiff has assured the Court he is not making. (*See* 8/20/15 Minute Entry.) Having made clear that the only "accommodation" he sought, and is now seeking, is full reinstatement to his job, Plaintiff is precluded from arguing at trial that he was denied a reasonable accommodation under the NYCHRL, or that Defendant's failure to engage in a good faith interactive process violated his rights under the NYCHRL.

## CONCLUSION

For the foregoing reasons, the Court DENIES both parties' motions for summary judgment,

as to both Plaintiff's FMLA interference and NYCHRL claims. The parties shall proceed to trial on those claims. At trial, Defendant will be precluded from arguing that (1) prolonged walking or standing were essential functions of Plaintiff's sales representative position, and (2) its January 25, 2013 letter to Plaintiff's doctors constituted notice of any fitness-for-duty certification requirement under the FMLA. Plaintiff will be precluded at trial from pursuing his NYCHRL claim on the basis of Defendant's failure (1) to provide reasonable accommodation or (2) to engage in a good faith interactive process to identify such an accommodation. The parties shall submit a proposed joint pre-trial order no later than November 4, 2016.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 15, 2016
        Brooklyn, New York